### Richmond

## POTOMAC ELECTRIC POWER COMPANY

### V.

## STATE CORPORATION COMMISSION AND WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

November 26, 1980.

Record No. 800721.

Present: All the Justices.

*Allen C. Barringer* (*Edward A. Caine,* on brief), for appellant.
*Russell W. Cunningham* (*Onkar N. Sharma; Donald A. Clower; Lewis S. Minter,* on briefs), for appellees.

POFF, J., delivered the opinion of the Court.

Code § 56-234, which prescribes the duty of a public utility "to furnish adequate service at reasonable and uniform rates", provides that

> "nothing herein contained shall be construed as applicable to schedules of rates, or contracts for service rendered by any . . . public utility to any municipal corporation or to the State or federal government."

Potomac Electric Power Company (PEPCO) challenges a State Corporation Commission (SCC) order holding that Washington Metropolitan Area Transit Authority (WMATA or the Authority) is a

governmental entity within the contemplation of this exemptive provision and that "the rates, terms and conditions of service offered by Pepco to WMATA are not subject to the jurisdiction of this Commission."

WMATA was established by an interstate compact among the Commonwealth of Virginia, the State of Maryland, and the District of Columbia to provide rapid transit service in the Washington, D.C., metropolitan complex. U. S. Const., art. 1, § 10; Va. Code §§ 56-529, -530; Md. Transp. Code Ann. §§ 10-204 *et seq;* D. C. Code §§ 1-1410 *et seq.* By contract dated June 29, 1976, PEPCO and WMATA agreed that

> "for a period of two years or until the Virginia State Corporation Commission assumes direct regulation over utility rates to governmental bodies, whichever shall occur first, the rate schedule RT applicable to the Authority in the District of Columbia shall apply to comparable sales of electricity to Authority in Virginia."

After the two-year term expired, the contracting parties began negotiations on new rates. On April 6, 1979, PEPCO filed with the SCC an application for a permanent increase in the rates on all its sales in Virginia. Included in the general application was a request for a VA-RT tariff on sales to "Rapid Transit Service" customers "in the Virginia portion of [PEPCO's] service area." This tariff represented an increase of 18.1% in the rate charged under the PEPCO-WMATA contract.

WMATA intervened and, asserting that its purchases from PEPCO are exempt from SCC regulation, filed a motion to "Dismiss Proposed Initial VA-RT Tariff or Institute Separate Proceedings". In an order dated January 16, 1980, the SCC declined to consider the VA-RT tariff request and continued proceedings on the remainder of the application pending a report by the hearing examiner on the other tariffs proposed. By final order entered April 24, 1980, the SCC granted permanent rate increases on those proposals. On appeal, PEPCO assigns error to the January 16, 1980 order.

■ Addressing the primary question presented by the errors assigned, we consider the character and status of WMATA. On brief, PEPCO says that WMATA "is not a *municipal* corporation" or a local government as defined by Article VII, § 1, of the Virginia Constitution, and that it "is not part of the *federal* government." We agree. We are of opinion, however, that WMATA is part of the *State* government.

Construing the language of the exemptive clause of Code § 56-234,

PEPCO contends that " 'State' means the State of Virginia." Since WMATA is not the State, PEPCO reasons, rates on its sales to WMATA are not exempt from SCC jurisdiction. But the word "State" modifies the word "government". Since the State government exists and functions only as the sum of its parts, we interpret the exemptive clause to apply to sales to every constituent part of State government.

A governmental entity is one created by government to perform a governmental function for a public purpose. *See Harrison* v. *Day,* 200 Va. 764, 774, 107 S.E.2d 594, 601 (1959). Title III, Article III, Section 4 of the interstate compact provides that WMATA "is hereby created, as an instrumentality and agency of each of the signatory parties hereto". Title III, Article VII, Section 18(a), states that "[t]he General Assembly of Virginia hereby authorizes and designates the Authority as the agency to plan for and provide transit facilities and services for the area of Virginia encompassed within the [compact] Zone." Two of the six members of WMATA's board of directors represent Virginia. Title III, Article III, Section 5(a). WMATA is vested with the power of eminent domain. Title III, Article XVI, Section 82(a). WMATA is funded, in part, by Virginia through the Northern Virginia Transit District Commission. *See* Code § 58-730.5.

Construing the compact in *Fairfax County* v. *County Executive,* 210 Va. 253, 262, 169 S.E.2d 556, 562 (1969), and noting that other courts "have recognized that an authority created and vested with power to establish and maintain subway or street railway projects . . . exercises a governmental function for public purposes", we characterized WMATA as a "publicly conceived, owned and controlled Authority . . . created under the Compact as an instrumentality and agency of Virginia, Maryland and the District of Columbia". Thus, just as the Virginia State Ports Authority may share its governmental function with a private concern without forfeiting its public character, *Harrison* v. *Day,* 202 Va. 967, 121 S.E.2d 615 (1961), an agency created to perform a governmental function for a public purpose does not lose its character as a governmental entity merely because it is a creature of an interstate compact.[1]

---

[1] Making no reference to the views expressed in *Fairfax County* or the standards outlined in the two *Harrison* decisions, PEPCO relies upon two opinions of federal district courts to support its view that WMATA is not a state agency. *C. T. Hellmuth* v. *Washington Metro. Area Trans.,* 414 F. Supp. 408 (D. Md. 1976), held that WMATA is not subject to the disclosure provisions of the Maryland Public Information Act; *Gay Activists Alliance of Washington, D. C., Inc.* v. *WMATA,* No. 78-2217 (D. D.C. July 5, 1979), held that WMATA is not subject to the provisions of the District of Columbia Human Rights Act of 1977. The rationale underlying those

Applying the principles announced in these cases, we hold that WMATA is a governmental entity within the intendment of the exemptive clause of Code § 56-234.

At the time its application was filed, PEPCO's only VA-RT customer was WMATA. But, PEPCO says, the rate it proposed for WMATA was "also a generally applicable rate, designed for any customer possessing the electrical load characteristics of a railroad". Consequently, PEPCO argues, its application invoked the "paramount jurisdiction" of the SCC to establish a rate schedule of "general applicability", *i.e.,* a schedule applicable to sales to customers generally, even though some purchases by some customers may fall within the exemptive clause of Code § 56-234.

The SCC's regulatory jurisdiction is not plenary. "Subject to such criteria and other requirements as may be prescribed by law, the [SCC] shall have the power and be charged with the duty of regulating the rates, charges, and services . . . of . . . electric companies." Va. Const., art. IX, § 2. In light of the preface to this constitutional mandate, "the authority of the SCC to regulate the rates charged by electric companies for service furnished to governmental entities is subordinate to the power of the General Assembly to command otherwise", and "[t]he exemptive provision of Code § 56-234 is just such a command otherwise." *Commonwealth* v. *VEPCO,* 214 Va. 457, 465, 201 S.E.2d 771, 777 (1974).

Yet, PEPCO insists that the SCC has authority under its application "to declare a reasonable rate for service which it cannot 'regulate' ", and once such a rate is declared, "[i]t is up to the utility and an 'exempt' customer to decide whether they will contract for the utility's service on some other basis; if not, the Commission-fixed rate of general applicability is available and service must be taken in accordance therewith."

The flaw in PEPCO's position is that the VA-RT tariff proposed in its application was germane only to sales to one customer whose purchases were exempt from SCC jurisdiction; it had no customer for jurisdictional sales. Nothing in the constitution or the statutes *requires*

opinions was that one party to this trilateral compact cannot unilaterally subject WMATA, an agent common to all, to a legal obligation *dehors* the compact. We find those opinions, sound as they may be, wholly inapposite to the case at bar. We are not asked to decide whether WMATA is subject to the provisions of Code § 56-234; our statute prescribes the public obligations of public utilities, not those of their customers. Rather, the issue before us is whether the obligations imposed by our statute are "applicable to schedules of rates, or contracts for service rendered by" PEPCO to WMATA.

the SCC to entertain an application for a tariff on non-existent sales to non-existent customers or to promulgate advisory rate schedules for sales expressly exempted by the General Assembly.

We hold, therefore, that the SCC did not err in declining to do so, and we will affirm the order.[2]

*Affirmed.*

---

[2] In its final order, the SCC fixed an "SL" rate schedule for PEPCO's sales to "agencies of Federal, State and Municipal Governments, for street, highway and park lighting purposes". This action was not challenged below or on appeal, and we do not decide whether the SCC exceeded its jurisdiction in fixing this schedule. *But see Commonwealth* v. *VEPCO, supra.* We hold only that the SCC was not *required* by law to entertain PEPCO's application for a VA-RT schedule.